SUMMARY ORDER

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of conviction be VACATED and the case REMANDED to the district court.
Josué Otoniel Rubi-Gonzalez appeals from a judgment of conviction and sentence entered in the United States District Court for the Eastern District of New York (Wexler, J.) on October 10, 2007. Rubi-Gonzalez was convicted, after a jury trial, of murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1), and conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5). Rubi-Gonzalez was sentenced principally to consecutive sentences of life imprisonment on the murder count, and ten years imprisonment on the conspiracy count.
Rubi-Gonzalez was a member of a street gang known as “MS-18”. In June 2003, he and two friends — Oscar Ortega and Leonard Sanchez, also members of MS-13, albeit from different “cliques” — purchased marijuana through a stranger they met on the street named Jesus Valentin. The three invited Valentin to smoke with them, and then stabbed and bludgeoned him to death, and stuffed his body into a sewer pipe. When Rubi-Gonzalez was eventually arrested, he admitted taking part in the murder.
A superseding indictment (“the Indictment”), returned February 2004, charged Rubi-Gonzalez, along with thirteen other members of MS-13, with a series of violent incidents on Long Island between August 2000 and September 13, 2003. Most of the counts were brought under the fed *485 eral violent crimes in aid of racketeering (“VICAR”) statute, 18 U.S.C. § 1959 et seq. According to the Indictment, MS-13 constituted an “enterprise” under 18 U.S.C. § 1959(b)(2) because it was an ongoing organization the activities of which affected interstate commerce. The Indictment alleged that the enterprise engaged in two forms of “racketeering activity” under 18 U.S.C. § 1961(1):(1) acts or threats involving murder as defined by New York State law, and (2) narcotics trafficking as defined by federal law.
The district court severed the charges against some of Rubi-Gonzalez’s co-defendants. Two co-defendants — David Vasquez and Ledwin Castro — proceeded to trial separately in July 2005. At their trial, the government called as an expert witness Hector Alicea, an officer with the New York State Police and a former member of the FBI’s Long Island Gang Task Force. United States v. Mejia, 545 F.3d 179, 186 (2d Cir.2008). Alicea testified as to the “enterprise structure and the derivation, background and migration of the MS-13 organization, its history and conflicts.” Id. (internal quotation marks omitted). He also testified that MS-13 had committed “between 18 and 22, 23” murders on Long Island since June 2000. Id. at 187 (internal quotation marks omitted). The jury convicted both Vasquez and Cas-tro of the charged VICAR offenses.
Rubi-Gonzalez proceeded to trial individually in October 2006, on two counts: conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5), and murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1). The trial focused exclusively on the murder of Valentin.
Without disputing that he took part in the murder of Valentin, Rubi-Gonzalez defended on the grounds that the murder was a random act of violence (not committed in order to maintain or increase his position in MS-13), and that MS13 was not an “enterprise” as defined in § 1959(b)(2).
The government’s case included testimony from Ortega and Sanchez. They testified that Valentin had told them that he was a member of the Latin Kings, a rival gang, and he was wearing a yellow shirt, the color of the Latin Kings. The government also called Hector Alicea, who (again) testified as to the history and structure of MS-13. Alicea testified that MS-13 engaged in acts and threats of murder (although he did not give specific numbers), and that they dealt narcotics. Alicea also narrated a home-video that showed members of different MS-13 cliques at a funeral of an MS-13 member in Hempstead, Long Island.
In the special verdict, the jury found: (1) that the MS-13 enterprise existed at the times relevant to the Indictment; (2) that MS-13 had an effect on interstate commerce; (3) that Rubi-Gonzalez was a a member of MS-13; (4) that MS-13 engaged in “acts or threats” of murder in violation of the laws of the State of New York; and (5) that Rubi-Gonzalez participated in both the murder and conspiracy to murder in order to maintain or increase his position in MS-13. Rubi-Gonzalez was sentenced to the mandatory minimum sentence of life imprisonment for murder in aid of racketeering, see 18 U.S.C. § 1959(a)(1), and a consecutive sentence of ten years on the conspiracy count.
After Rubi-Gonzalez was convicted, and while his appeal was pending, this Court overturned the convictions of Vasquez and Castro on the ground that the testimony of Hector Alicea was improperly admitted at their trial, and the error was not harmless beyond a reasonable doubt. Mejia, 545 F.3d at 208.
Rubi-Gonzalez appeals on three grounds: (1) that there was insufficient evidence for a jury to find that MS-13 was *486 a single “enterprise”, or that he took part in the murder of Jesus Valentin so as to maintain or increase his position in MS-13; (2) that Alicea’s testimony was erroneously admitted; and (3) that he was deprived of a fair trial by reason of confusing comments made by the trial judge and prosecutor. We examine each of his arguments in turn.
Sufficiency
MS-13’s “enterprise” status. The evidence was sufficient to establish that MS-13 constituted a single “enterprise”. An enterprise is “a group of persons associated together for a common purpose of engaging in a course of conduct.” United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); see also 18 U.S.C. § 1959(b)(2) (defining “enterprise”). An “enterprise” must have an existence separate from the series of criminal acts that constitute its racketeering activity. Turkette, 452 U.S. at 583, 101 S.Ct. 2524. Numerous witnesses testified to MS-13’s membership rules, its organizational structure in this country and El Salvador, and the so-called “universal” meetings where different cliques met together. Alicea testified about MS-13’s history, its national scope, and the symbols common to different cliques.[1] Rubi-Gonzalez’s own lawyer conceded on summation that “obviously MS-13 exists.” Drawing all reasonable inferences in favor of the government, the evidence was more than sufficient for a jury to conclude that MS-13 was a single “enterprise”, a national organization, organized into local subunits. See also Mejia, 545 F.3d at 203 (“we have no difficulty finding that the evidence was sufficient to show that MS-13 satisfied th[e] definition [of an ‘enterprise.’]”).
Position-related motivation. The evidence was also sufficient for the jury to find that Rubi-Gonzalez committed the murder to “maintain[] or increas[e] position” in MS-13, 18 U.S.C. § 1959(a). Although Rubi-Gonzalez argues that the murder was a crime of madness, “almost without purpose”, based upon the evidence, “the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.” United States v. Concepcion, 983 F.2d 369, 381 (2d Cir.1992). A former MS-13 member testified about how MS-13 had a “fight at first sight” policy with regard to rival gangs. Another member testified that MS-13 members gain respect through acts of violence. As to the murder of Valentin, Sanchez testified that he had told Valentin not to tell Rubi-Gonzalez and Ortega that he was a Latin King, “because I knew if they found out, there was going to be a problem.” Ortega testified that in the minutes before the murder, he told Rubi-Gonzalez that they “had to do something” because Valentin was a “Chav[alla],” a rival gang member. Ortega and Sanchez confirmed that Valentin was wearing yellow. Moreover, after the murder, other MS-13 members testified that Rubi-Gonzalez started “gaining more respect” within MS-13. Accordingly, the evidence was sufficient to conclude that Rubi-Gonzalez had the necessary position-related motivation. See United States v. Thai, 29 F.3d 785, 817 (2d Cir.1994) (“[s]elf-promotion need not have been the defendant’s only, or even his primary, concern, if [the act] was committed ‘as an integral aspect of membership’ *487 in the enterprise.”)(quoting Concepcion, 983 F.2d at 381).
Alicea’s Testimony
Rubi-Gonzalez next contends that the admission of Alicea’s testimony was error because he lacked qualifications, his testimony violated Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and it lacked probative value.
In Mejia, we ruled that Alicea was properly qualified as an expert, 545 F.3d at 193-94, but we also held that the district court erred in admitting large swaths of his testimony for a number of overlapping reasons. First, Alicea’s testimony exceeded the bounds of expert testimony when he testified about matters that the average juror could understand unaided. Id. at 194-96. Alicea testified as a “de facto case agent in providing ... summary information to the jury (the case being the ongoing investigation into MS-13’s activities on Long Island).” Id. at 196 (internal quotation marks omitted). Second, we ruled that some of Alicea’s testimony violated Fed.R.Evid. 703 because his expert testimony “ ‘repeatfed] hearsay evidence without applying any expertise whatsoever,’ a practice that allows the Government ‘to circumvent the rules prohibiting hearsay.’ ” Id. at 197 (quoting United States v. Dukagjini, 326 F.3d 45, 59 (2d Cir.2003)). Third, reliance on, and repetition of, out-of-court testimonial statements made by individuals during the course of custodial interrogations violated the defendants’ Confrontation Clause rights under Crawford. Id. at 198-99.
Following Mejia, we conclude that Ali-cea was properly qualified as an expert, but that his testimony was erroneously admitted, for much the same reasons.
Inadmissibility. First, Alicea testified that MS-13 dealt in marijuana and cocaine, stole cars, and murdered rival gang members in the course of “turf’ wars. This testimony “ranged from MS-13’s activities on Long Island to aspects of the gang’s operations more generally,” and thus “went far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy.” Id. at 195 (internal citations omitted). As we wrote in Mejia, Alicea’s testimony here “essentially summarized the results of the [FBI] Task Force investigation on Long Island.” Id.
Second, Alicea’s testimony violated Fed.R.Evid. 703 by transmitting hearsay evidence directly to the jury. See Mejia, 545 F.3d at 197-98. Alicea acknowledged that hearsay evidence—including books, newspaper articles, websites, audio recordings, and conversations with other law enforcement officers—was the source of much of his information on MS-13. Although at trial he was not asked to identify the sources for specific parts of his testimony, he noted that he learned from other law enforcement officers that one particular MS-13 clique was transporting cocaine across the country. In the Mejia trial, he said he discovered his information about MS-13’s involvement in Mexican immigrant smuggling (which he also testified to in this trial) through “research on the Internet”. Mejia, 545 F.3d at 197. Of course, not all of Alicea’s testimony transmitted hearsay, but as was true in Mejia so, too, here, “at least some of his testimony involved merely repeating information he had read or heard-information he learned from witnesses through custodial interrogations, newspaper articles, police reports, and tape recordings.” Id.
Third, some of Alicea’s testimony may also have violated Crawford by communicating “out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion.” United States v. Lombardozzi, 491 F.3d 61, 72 (2d Cir. *488 2007). The record in this case is not clear as to whether Alicea in fact conveyed any such statements to the jury, but there seems to be a serious likelihood that he did. Alicea testified that he personally arrested between 50 and 60 MS-13 members, and he interviewed over 100 MS-13 members. In cross-examination at the Mejia trial, he acknowledged at least one fact he testified about that he had learned directly from an MS-13 member undergoing custodial interrogation. 545 F.3d at 199. We noted that the direct conveyance of this one statement “impugns the legitimacy of all of his testimony and strongly suggests to us that Alicea was simply summarizing an investigation by others that was not part of the record.” Id. (internal quotation marks and alteration omitted). Although the present record is less clear, we have similar concerns about his testimony at Rubi-Gonzalez’s trial.
Harmless error. The dispositive question is whether the erroneous admission of Alicea’s testimony was “harmless beyond a reasonable doubt” with respect to each required element of the crime. See United States v. Reifler, 446 F.3d 65, 87 (2d Cir.2006).
In Mejia, we concluded that the admission of Alicea’s testimony was harmless beyond a reasonable doubt with respect to MS-13’s enterprise status, and MS-13’s affect on interstate commerce, but it was not harmless beyond a reasonable doubt with respect to whether MS-13 engaged in acts or threats of murder: “[a]part from Alicea’s testimony, the Government introduced only circumstantial evidence tending to prove that [MS-13 engaged in acts or threats of murder]; evidence that, though capable of supporting a jury’s finding of guilt, does not compel such a determination.” 545 F.3d at 202.
Here, we conclude that Alicea’s erroneously admitted testimony was not harmless with respect to two elements of the crimes of conviction: the “acts or threats of murder” element and the element that MS-13 engaged in interstate commerce.
The jury found that MS-13 was an “enterprise” engaged in “racketeering activity” on the basis of “acts and threats of murder” in violation of the laws of the State of New York. Alicea’s testimony with respect to this element was short, but definitive. He testified, simply, that MS-13 had committed multiple murders on Long Island and elsewhere.
The government elicited a lot of testimony from other witnesses as to MS-13’s involvement in acts and threats of murder, but little of it was substantial, and almost all of it was “tough talk”. Id. at 201. For example, Sanchez testified that the best way to earn respect in MS-13 was to “tak[e] care of someone ... kill[ ] somebody.” Ortega said of a former MS-13 member who had dropped out of MS-13 to join the Latin Kings, “any time we see him we got to kill him.” The MS-13 witnesses all agreed that if any MS-13 member cooperated with the police, they would receive the “death penalty”.
The closest the government came to tying MS-13 to a specific murder was an audio-recording between Rubi-Gonzalez and a confidential informant in which Rubi-Gonzalez discusses getting “authorization” to kill a rival gang member, a member of a gang called “MT”. A Suffolk County Police Officer subsequently confirmed the murder of one “MT”. However, on the audiotape, Rubi-Gonzalez explicitly denied responsibility for the actual murder. He told the confidential informant: “We ... didn’t do it.... Other, other guys killed him.... I don’t know who killed him.”
After carefully considering the evidence introduced at trial, we are not convinced that the introduction of Alicea’s testimony *489 as to acts and threats of murder was harmless beyond a reasonable doubt. See Mejia, 545 F.3d at 202 (“Where, as here, the Government must demonstrate acts and threats of murder, yet the Government introduces no admissible evidence of murder and only circumstantial evidence of threats, we cannot find the admission of direct evidence of multiple murders to have been harmless.”)
Rubi-Gonzalez’s convictions under § 1959(a) also required the government to prove that MS-13 is “engaged in” or its “activities ... affect” interstate or foreign commerce.
Alicea testimony as to MS-13’s affect on interstate and foreign commerce was extensive. He testified about the link between MS-13 and El Salvador, and about MS-13 meetings in Virginia that were attended by cliques from California and Long Island. He stated that MS-13 members commit crimes while at interstate meetings, and often move to other states to flee from law enforcement or to establish new cliques. Further, he testified that MS-13 stole automobiles, shipped cocaine from state-to-state, used Western Union to transmit money between cliques, and even shared guns with other MS-13 cliques in different states.
The testimony of other witnesses as to MS-13’s effect on interstate or foreign commerce was seant. Various witnesses testified about the existence of MS-13 cliques in other states, and noted that certain “universal” meetings were attended by cliques from different states. They also mentioned that MS-13 members occasionally use cars and cell phones. But much of this testimony was perfunctory and based on hearsay; none of it was as compelling or overwhelming as Alicea’s.
Therefore, Rubi-Gonzalez’s convictions must be vacated. Our finding of non-harmless error is fatal to his conviction on both counts.
Having concluded that Rubi-Gonzalez’s conviction cannot stand, we need not consider his other arguments. For the foregoing reasons, we hereby VACATE the judgment of conviction and REMAND the case to the district court for further proceedings.

. In assessing a sufficiency claim, we consider all the evidence presented at trial, even improperly admitted evidence. United States v. Cruz, 363 F.3d 187, 197 (2d Cir.2004)(“where some government evidence was erroneously admitted, we must make our determination concerning sufficiency taking into consideration even the improperly admitted evidence.”).