10-3411-cr (L)
USA v. Rodriguez and Moore

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, in the City of New York, on the 16th day of February, two thousand twelve.

Present:
  ROBERT D. SACK,
  ROBERT A. KATZMANN,
  BARRINGTON D. PARKER,
    *Circuit Judges*.

———————————————————————————

UNITED STATES OF AMERICA,

  *Appellee*,

   v.           Nos. 10-3411-cr (L),
               10-4214-cr (con)

JOSE ESCOBAR, also known as RAFA,
NELSON CALDERON, also known as SHORTY,
JOHN ROMAN, also known as J.R.,

  *Defendants*,

AMADEO RODRIGUEZ, CHRISTOPHER MOORE,
also known as BLACK BOY, also known as BLACK,

  *Defendants-Appellants*.

———————————————————————————

For Appellee:      CHARLES N. ROSE, Assistant United States Attorney (Peter A. Norling, Lara Treinis Gatz, *on the brief*), *for* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, N.Y.

For Defendant-Appellant          STEVE ZISSOU (Randall D. Unger, on the brief), Steve Zissou
Amadeo Rodriguez:                & Associates, Bayside, N.Y.

For Defendant-Appellant          JOHN S. WALLENSTEIN, Garden City, N.Y.
Christopher Moore:

Appeal from the United States District Court for the Eastern District of New York (Feuerstein, *J.*).

**ON CONSIDERATION WHEREOF**, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgments of the district court be and hereby are **AFFIRMED**.

Defendants-Appellants Amadeo Rodriguez and Christopher Moore appeal from judgments of conviction entered by the district court on August 20, 2010. Each was found guilty, after a jury trial, of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5); assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3); conspiracy to commit assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(6); three counts of discharge of a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); and three counts of use of explosives to commit a felony, in violation of 18 U.S.C. § 844(h)(1). Rodriguez was also convicted of three additional counts of assault with a dangerous weapon in aid of racketeering; an additional count of conspiracy to commit assault with a dangerous weapon in aid of racketeering; an additional count of discharge of a firearm in connection with a crime of violence; and an additional count of use of explosives to commit a felony. Rodriguez was sentenced principally to life in prison plus 70 years, and Moore was sentenced principally to life in prison plus 45 years.

2

Rodriguez and Moore, joining in each other's claims pursuant to Fed. R. App. P. 28(i), argue on appeal that: (1) the admission of the expert testimony provided by investigator Hector Alicea violated the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment; (2) the government's alleged pre-trial deportation of two witnesses violated the defendants' right to compulsory process; (3) the district court erred when it denied the defendants' respective motions to sever; (4) the district court's "*Pinkerton* charge" deprived defendants of a fair trial; and (5) the sentences imposed on the defendants were procedurally and substantively unreasonable. We assume the parties' familiarity with the facts and procedural history of this case, which we discuss only as necessary to explain our decision.

We first consider the defendants' contention that the admission of the expert testimony provided by investigator Hector Alicea violated the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment. Defendants' convictions arise from their alleged participation in violence committed by "Neta,"[1] a street gang operating on Long Island. The crimes charged in the seventeen-count superseding indictment ("Indictment") primarily concern the following three incidents: (1) an assault committed by Rodriguez and other Neta members on two individuals in the Freeport Industrial Area of New York on July 18, 2000 (Counts Three through Five) (the "Freeport Industrial Area Incident"); (2) violent acts committed on January 1, 2001 against members of the rival gang La Mara Salvatrucha ("MS-13"), including Rodriguez's fatal shooting of Giovanni Aguilar as he left a house on Jay Street (Counts One, Two, Eight through Eleven, Fourteen and Fifteen) and Moore's firing of multiple shots into the same house

_____

[1] In the briefs, the name of the gang is alternatively spelled "Neta," "Netas," and "Nètas." We will refer to the gang as "Neta" for the sake of convenience.

(Counts Six, Seven, Twelve, Sixteen) (the "Jay Street Incident"); and (3) Rodriguez's involvement in an April 23, 2003 assault with a weapon on MS-13 members on Sunrise Highway in Bellmore, New York (Counts Nine, Thirteen, and Seventeen) (the "Sunrise Highway Incident").

During the trial, which commenced on May 19, 2008, the government called investigator Hector Alicea, an officer with the New York State Police, as "an expert on the structure and operation of the Nètas street gang." Special App. 12. Alicea testified, *inter alia*, that Neta was a violent organization whose members were "involved in narcotics trafficking, auto theft, assaults, murders, robberies," J.A. 454; that members of Neta could enhance their status within the gang by "committing crimes on behalf of the gang, whether it be dealing narcotics or stealing cars or committing assaults or procuring weapons or anything of that nature," including murder, *id.* at 457; that Neta members who violated the gang's rules were disciplined for their infractions and that the punishment might be in the form of assault "or even sometimes murder," *id.* at 456; and that encounters between members of Neta and MS-13 were generally violent, *id.* at 461.

On June 18, 2008, the jury convicted both defendants of all counts with which they were charged. On October 6, 2008 -- after the defendants had been convicted but before they had been sentenced -- this Court issued an opinion addressing the admissibility of expert testimony offered by Hector Alicea in a different case involving the MS-13 gang. *See United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008). In *United States v. Mejia*, we held that the district court erred in admitting Alicea's testimony for three principal reasons. First, Alicea testified about matters not beyond the ken of the average juror in violation of Fed. R. Evid. 702. *Id.* at 194-96. Second, portions of Alicea's testimony violated Fed. R. Evid. 703 because he "'repeat[ed] hearsay evidence without applying any expertise whatsoever,' a practice that allows the Government 'to

4

circumvent the rules prohibiting hearsay.'" *Id.* at 197 (quoting *United States v. Dukagjini*, 326 F.3d 45, 59 (2d Cir. 2003)).  Third, Alicea's repetition of out-of-court testimonial statements made by individuals during the course of custodial investigations violated the defendants' Confrontation Clause rights under *Crawford v. Washington*, 541 U.S. 36 (2004).  *Mejia*, 545 F.3d at 198-99.  We further found that these errors were not harmless beyond a reasonable doubt with respect to each required element of the crimes at issue.  *Id.* at 202.

Following our decision in *Mejia*, the defendants filed a joint motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  By Opinion and Order dated April 5, 2010, the district court denied the motion.  *See United States v. Rodriguez*, No. 03 CR 1342 (SJF), 2010 U.S. Dist. LEXIS 33999 (E.D.N.Y. Apr. 5, 2010).  The district court concluded, *inter alia*, that Alicea's testimony was proper and that any error was harmless in any event because Alicea's testimony was cumulative of: (1) a stipulation entered into by the government and the defendants on June 11, 2008 setting forth the facts of the murder case against Joanna Pimentel ("La Madrina"), the "godmother" of Neta, *see generally United States v. Pimentel*, 346 F.3d 285 (2d Cir. 2003); and (2) the testimony of four cooperating Neta gang members.  *See Rodriguez*, 2010 U.S. Dist. LEXIS 33999, at *9-12.  After denying the motion, the district court proceeded with sentencing on July 27, 2010.

On appeal, defendants rely on *Mejia* to argue that the admission of Alicea's testimony violated Rules 702 and 703 of the Federal Rules of Evidence and the Confrontation Clause.  We review the district court's admission of expert testimony for abuse of discretion, and we will not find error unless the district court's ruling was "manifestly erroneous."  *Dukagjini*, 326 F.3d at 52 (internal quotation marks omitted).  Having reviewed the record *de novo*, we find no error with

5

respect to the Confrontation Clause. As stated in *Mejia*, we have determined that an officer expert's testimony violates defendants' Confrontation Clause rights under *Crawford* "'if [the expert] communicated out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of an expert opinion.'" *Mejia*, 545 F.3d at 198 (alteration in original) (quoting *United States v. Lombardozzi*, 491 F.3d 61, 72 (2d Cir. 2007)). In this case, unlike in *Mejia*, there is no evidence that Alicea communicated any out-of-court testimonial statements to the jury. Defendants' arguments to the contrary are pure speculation. We thus find that the admission of Alicea's testimony did not violate defendants' Confrontation Clause rights under *Crawford*.

Nonetheless, we conclude that much of Alicea's testimony was erroneously admitted in violation of the Federal Rules of Evidence for largely the same reasons explained in *Mejia*. First, Alicea's testimony "went far beyond interpreting jargon or coded messages, describing membership rules, or explaining organizational hierarchy." *Mejia*, 545 F.3d at 195 (internal citations omitted). By testifying to facts "well within the grasp of the average juror," *id.* at 194, Alicia's testimony violated Fed. R. Evid. 702. *See also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."). Second, Alicea acknowledged that hearsay evidence -- including blogs, documents, and conversations with other law enforcement officers -- was the source of much of his information concerning Neta. J.A. 447-49. Accordingly, his testimony violated Fed. R. Evid. 703. *See United States v. Rubi-Gonzalez*, 311 Fed. App'x 483, 487 (2d Cir. 2009) (summary order) ("Alicea's testimony violated Fed. R. Evid. 703 by transmitting hearsay evidence directly to the jury."); *see also Mejia*, 545 F.3d at 197-98.

Having found error in Alicea's testimony, the dispositive question is whether the erroneous admission of that testimony was "'harmless beyond a reasonable doubt' with respect to each required element of the crime[s]" charged in the Indictment. *Rubi-Gonzalez*, 311 Fed. App'x at 488 (citation omitted). "Several factors are relevant when evaluating the error's likely impact: (1) the strength of the Government's case; (2) the degree to which the statement was material to a critical issue; (3) the extent to which the statement was cumulative; and (4) the degree to which the Government emphasized the inadmissible evidence in its presentation of its case." *Mejia*, 545 F.3d at 199. In this case, Alicea's testimony was relevant to establishing the various RICO charges alleged in the Indictment. In order to sustain a conviction on the RICO counts, the government was required to prove that Neta was an enterprise that had an effect on interstate commerce. It was also required to prove the two predicate acts alleged in the Indictment: (1) that Neta engaged in acts involving murder; and (2) that Neta engaged in narcotics trafficking.

Having reviewed the record *de novo*, we conclude that the government's case was strong with respect to each of these elements and that Alicea's testimony was cumulative of other admissible evidence in the record. With respect to whether Neta was an enterprise that had an effect on interstate commerce, the prosecution called four former Neta gang members who testified extensively about, *inter alia*, the history of the gang, the hierarchy and structure of the gang, the rules of the gang, the hand signs of the gang, the meetings traveled to and attended by the gang members during which prayers were recited, the carrying of guns or other weapons by the members, the discipline meted out by the gang, the dues collected by the gang from its members and how the funds were used, and the gang's tattoos and colors worn by the gang's members. This testimony concerning the gang's history, hierarchy, and internal rules was more than sufficient to

establish that Neta is an "enterprise" under RICO. *See generally Boyle v. United States*, 556 U.S. 938 (2009). Additionally, several of the cooperating witnesses testified that they traveled to meetings which drew gang members from multiple states, thus establishing that Neta had an effect on interstate commerce. Thus, we are satisfied that Alicea's erroneously admitted testimony on these issues was harmless beyond a reasonable doubt. *See Mejia*, 545 F.3d at 200-01 (concluding that Alicea's erroneously admitted testimony on both MS-13's enterprise status and effect on interstate commerce was harmless because it was cumulative of other testimony concerning the "gang's structure, membership rules, symbols, . . . history" and interstate activities).

With respect to whether Neta engaged in acts involving murder, the same four witnesses testified to the many acts of violence engaged in by the gang's members, including the murders committed at the direction of La Madrina. Moreover, and of particular importance, the defendants themselves *stipulated* to all of the facts of the murders carried out at the behest of La Madrina. J.A. 934-37. Thus, in stark contrast to *Mejia*, where "Alicea was alone in testifying that MS-13 had actually committed eighteen to twenty-two or twenty-three murders in the preceding five years," and "much of the remaining evidence consist[ed] of what [was] essentially 'tough talk,'" *Mejia*, 545 F.3d at 201, here the defendants themselves *conceded* that Neta engaged in acts involving murder.

Finally, the four cooperating witnesses offered detailed testimony about Neta's drug dealing activities, testimony that was emphasized in summation. For example, witness Jose Escobar offered extensive testimony about his own drug dealing and that of Neta members generally:

Q: Have you ever dealt drugs?
A: Yes, I did.

Q: What drugs did you deal?
A: Coke, Ecstacy and marijuana.
. . .
Q: Where did you deal your drugs?
A: Mainly in Freeport.
. . .
Q: How long were you dealing drugs in Freeport?
A: Like two or three years.
. . .
Q: Did you pay your dues [of $2 to $5 at each meeting]?
A: Yes. I guess I did.
Q: How did you get the money to pay your dues?
A: Either I was working or I was selling drugs.
. . .
Q: And did other Netas members sell drugs?
A: Yes.
Q: And of the total amount of Netas members that you were familiar with, what portion or what percentage sold drugs?
A: More than half.
. . .
Q: Did your membership in the Netas assist you in your drug selling?
A: Yes, yes.
Q: How?
A: They would get me customers.  They wouldn't even try to rob me or something like that, because I had protection for that, too.
Q: Did you ever get drugs from Netas memebrs?
A: Yes.
Q: Drugs that you later sold?
A: Yes.
Q: Did you ever supply other Netas members with drugs?
A: Yes.

J.A. 698, 704-05.  Other witnesses offered similar testimony.  Accordingly, we are convinced that

Alicea's testimony was cumulative of other evidence in the record with respect to each required

element of the crimes charged, and that the erroneous admission of Alicea's testimony was

therefore harmless beyond a reasonable doubt.  *See United States v. Reifler*, 446 F.3d 65, 87 (2d

Cir. 2006).

9

We turn next to defendants' second argument, *i.e.*, that "the government's pre-trial deportation of two witnesses who would have provided material and favorable testimony violated the [defendants'] right to compulsory process." Rodriguez's Br. 52 (capitalization removed). The Sixth Amendment guarantees a defendant the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. "At the same time, a defendant who alleges a violation of due process and compulsory process due to a missing witness must show the witness would have provided 'favorable evidence which was neither cumulative nor irrelevant.'" *United States v. DeSena*, 287 F.3d 170, 176 (2d Cir. 2002) (quoting *Singleton v. Lefkowitz*, 583 F.2d 618, 623 (2d Cir. 1978)). "Where the prosecution is responsible for the unavailability of a witness, the defendant's burden is lighter in this respect, but does not disappear altogether." *Id.* (internal citation omitted); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-73 (1982) ("Sanctions may be imposed on the Government for deporting witnesses only if the criminal defendant makes a plausible showing that the testimony of the deported witnesses would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses."). In this case, it is unclear whether the government deported just one witness or both witnesses. We need not address this issue, however, because even assuming the government deported both witnesses, defendants have not met even their "lighter" burden of showing that either witness would have provided "favorable evidence which was neither cumulative nor irrelevant." Defendants' assertion that the unavailable witnesses would have provided favorable evidence is severely undermined by the fact that the defendants voluntarily declined to introduce the written statements previously given by the very same witnesses at issue. Indeed, had defendants introduced those statements, the witnesses' purportedly "favorable

10

evidence" would have been introduced at trial. Moreover, the evidence was largely cumulative of the trial testimony provided by Jenny Aguilar. Accordingly, defendants have not shown a violation of compulsory process.[2]

Defendants next argue that the district court erred by denying their motions to sever. There is a preference in the federal system for joint trials of defendants who are indicted together, because joint trials promote efficiency and avoid the problem of inconsistent verdicts. *See Zafiro v. United States*, 506 U.S. 534, 537 (1993); *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). "Joint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy . . . ." *Spinelli*, 352 F.3d at 55. However, Rule 14 of the Federal Rules of Criminal Procedure provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." *Id.* Motions to sever under

---

[2] It is unclear to what extent the defendants claim that the purported violation of the right to compulsory process also constitutes a *Brady* violation. To the extent defendants do advance this argument, however, it must fail. It is well established that the government must disclose to the defense evidence that is favorable to the accused when such evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In this case, the government disclosed the statements of the witnesses well in advance of trial. The government also disclosed the witnesses' names about two and one-half months prior to trial. Thus, the evidence at issue was not suppressed. Morever, even assuming *arguendo* that the witnesses' names should have been disclosed earlier, defendants cannot claim to have suffered prejudice when they declined the government's offer to introduce the statements at trial. *See United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (citing *United States v. Brown*, 582 F.2d 197, 200 (2d Cir. 1978); *Joseph v. Coyle*, 469 F.3d 441, 472 (6th Cir. 2006) ("[I]t appears that the defense declined to re-call [the witness] for strategic reasons . . . so that choice cannot now be used to attempt to magnify the prejudice of the delay."); *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (holding that there was no prejudice from a delayed disclosure where the "[d]efendant was given every opportunity to review the tapes [the prosecutor had previously 'forgotten to turn over'] and to recall [the witness] if necessary, but he refused to do so").

Rule 14 are committed to the sound discretion of the district court and are "[c]onsidered virtually unreviewable." *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999) (internal quotation marks and citations omitted). "To show an abuse of discretion, a defendant must demonstrate that the denial of the motion caused substantial prejudice, that is, prejudice so severe as to amount to a denial of a constitutionally fair trial." *Id.* (internal quotation marks and citation omitted).

Defendants do not come close to meeting these rigorous standards. Rodriguez claims that severance was required because Rodriguez and Moore relied on "mutually antagonistic" defenses. Rodriguez's Br. 60. In order to make a showing of "mutually antagonistic" or "irreconcilable defenses," however, "the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (internal quotation marks and brackets omitted). The mere fact that defense theories are "inconsistent" is insufficient under this standard. *Id.* In this case, although Moore's theory that Aguilar had been murdered by two light-skinned members of Neta was arguably inconsistent with Rodriguez's theory that Aguilar had been murdered by two black men, Moore never suggested that Rodriguez was responsible for the murder. Indeed, Moore specifically argued that Aguilar had been murdered by two other gang members. Thus, the jury could have readily found that both Rodriguez and Moore were innocent of the murder. *Id.*[3] For his part, Moore argues that "joinder of the Freeport Industrial Area incident and the Sunrise Highway shooting, both of which involved Amadeo Rodriguez and other individuals, and both of which

---

[3] Moreover, even "when two defendants both claim they are innocent and each accuses the other of the crime," the Supreme Court has concluded that "defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540.

12

included violent acts of assault and weapons use, but neither of which included any reference whatsoever to Christopher Moore, was extremely prejudicial to Moore." Moore's Br. 11 (emphasis omitted). This contention is without merit. A court may properly maintain a joint trial even if it will result in the admission of testimony about other crimes in which a codefendant played no part. *See Diaz*, 176 F.3d at 103. Indeed, because the government in this case was required to prove the existence of a racketeering enterprise, evidence concerning the Freeport Industrial Area Incident and the Sunrise Highway Incident would have been admissible against Moore even in a separate trial. *See United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992) (holding that because the government must prove the existence and pattern of racketeering, evidence of acts in which the defendants did not play a part is admissible against each defendant and claims "that separate trials would eliminate the so-called spillover prejudice [are] at least overstated if not entirely meritless"). We therefore conclude that the district court did not abuse its discretion in denying defendants' respective motions to sever.

We turn next to defendants' contention that the district court's *Pinkerton* charge deprived them of a fair trial. Under the *Pinkerton* doctrine, "a jury [may] find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." *United States v. Miley*, 513 F.2d 1191, 1208 (2d Cir.1975) (citing *Pinkerton v. United States*, 328 U.S. 640, 645 (1946)). "We review challenged jury instructions *de novo* but will reverse only if all of the instructions, taken as a whole, caused a defendant prejudice." *United States v. Bok*, 156 F.3d 157, 160 (2d Cir. 1998).

13

In this case, defendants argue that because the government's theory of the case was that Moore and Rodriguez were the actual perpetrators, "the *Pinkerton* charge was inappropriate and unfairly prejudicial[] as it allowed the jury to speculate and to find guilt even if they [sic] felt that the Government had not proven its case beyond a reasonable doubt." Moore's Br. 18. This argument is unavailing. Although it is true that a *Pinkerton* charge "should not be given as a matter of course," *United States v. Sperling*, 506 F.2d 1323, 1341 (2d Cir. 1974), this caution is rooted in a concern that the jury may improperly infer the existence of the conspiracy "from the series of criminal offenses committed." *Id.* at 1342. *See also Salameh*, 152 F.3d at 149 ("We have cautioned that the *Pinkerton* charge should not be given as a matter of course and in particular where the evidence is such that the jury is required to resort to the inverse of *Pinkerton* and infer the existence of a conspiracy from the series of disparate criminal offenses.") (internal quotations omitted). Defendants do not assert that this concern is at issue in this case. To the contrary, the district court's charge clearly indicated that in order to find the defendants guilty under a *Pinkerto*n theory of liability, it was essential that the jury first "find beyond a reasonable doubt that a defendant was a member of a charged conspiracy of the indictment." J.A. 1074; *see also Salameh*, 152 F.3d at 149-50 ("[T]he district court cautiously instructed the jury that [the defendant] could be found guilty of the substantive crimes only after the jury had concluded that he was a conspirator.").

Moreover, defendants offer no precedent for the proposition that a defendant cannot be found guilty on a *Pinkerton* theory of liability once the government has submitted independent evidence that the defendant committed the substantive crime in question. Indeed, the *Pinkerton* Court held that "it is not material that overt acts charged in the conspiracy counts were also

14

charged and proved as substantive offenses," *Pinkerton*, 328 U.S. at 644, and we have consistently affirmed cases in which a *Pinkerton* charge was given even when the government submitted evidence suggesting that the defendant committed or aided the substantive crime(s) in question. *See, e.g., United States v. Malpeso*, 115 F.3d 155, 166 (2d Cir. 1997) (argument that the district court erred in instructing the jury on both aiding and abetting and *Pinkerton* liability was "wholly frivolous"); *United States v. Harwood*, 998 F.2d 91, 100 (2d Cir. 1993) (defendant possessed controlled substance); *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (defendant "personally committed most of the substantive acts himself during and in furtherance of the conspiracy"). Accordingly, the district court's *Pinkerton* charge was not improper.

Finally, defendants challenge the sentences imposed by the district court. It is well established that we review sentences for both procedural and substantive and substantive reasonableness. *United States v. Verkhoglyad*, 516 F.3d 122, 127 (2d Cir. 2008). When a defendant fails to object at sentencing to the procedures employed by the district court, the procedural reasonableness of his sentences is reviewed, not only for abuse-of-discretion, but under the more deferential plain error standard of review. *Id.* at 128; *United States v. Villafuerte*, 502 F.3d 204, 208 (2d Cir. 2007) ("[W]e now expressly hold that rigorous plain error analysis is appropriate for such unpreserved [sentencing] errors."). Pursuant to this standard, there must be an "error" that is "plain" and that affects "substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal quotation marks and brackets omitted). Moreover, the decision to correct a forfeited error lies "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

15

In this case, because neither defendant objected to the sentencing procedures employed by the district court, the procedural reasonableness of their sentences is subject to plain error review. Although the district court did not discuss the Section 3553(a) factors or the Guidelines on the record, "we presume, in the absence of record evidence suggesting otherwise, that a sentencing judge has faithfully discharged her duty to consider the statutory factors[, . . . and] we will not conclude that the district judge shirked her obligation to consider the § 3553(a) factors simply because she did not discuss each one individually or did not expressly parse or address every argument relating to those factors that the defendant advanced." *United States v. Fernandez*, 443 F.3d 19, 30 (2d Cir. 2006). *See also Verkhoglyad*, 516 F.3d at 129 ("While our review is undoubtedly made easier if a district judge explicitly references the § 3553(a) factors, we have declined to prescribe any specific verbal formulations to demonstrate the adequate discharge of the duty to consider matters relevant to sentencing.") (internal quotation marks and ellipsis omitted)). Additionally, defendants did not object to the Guidelines calculations set forth in the PSRs, and the only two issues they did raise with respect to sentencing -- the potential merger of certain counts and the consecutive nature of certain sentences -- were addressed by the district court on the record. Moreover, even assuming the district court plainly erred by failing adequately to discuss its reasoning on the record, we conclude that defendants' "substantial rights" were not affected because each defendant received a statutorily-required life term of imprisonment that he does not challenge on appeal. Thus, we decline to exercise our discretion to correct any forfeited error that may have been committed in this case.

Defendants also argue that their sentences were substantively unreasonable because the imposition of consecutive sentences was "excessive and unreasonable." Moore's Br. 23. This

16

argument is without merit.  It is well settled that separate punishments are authorized for a substantive crime and conspiracy to commit the same crime.  *See Callanan v. United States*, 364 U.S. 587, 591-95 (1961).

We  have considered the defendants' remaining arguments and find them to be without merit.  For the reasons stated herein, the judgments of the district court are **AFFIRMED**.


FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK